IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 06-20160-04-JWL |
| ) | |
| DULCE GARCIA, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____) | |

## **MEMORANDUM AND ORDER**

Dulce Garcia has filed a motion to suppress statements made by her to Officer Eric Jones or Deputy Jesse Valdez on November 6, 2006, prior to her formal arrest, on the basis that the officers failed to give her *Miranda* warnings before eliciting the statements (Doc. #32). On March 19, 2007, the Court conducted a hearing on the motion, at which the parties presented testimony and arguments. For the reasons set forth herein, Ms. Garcia's motion is granted, and the Government may not use the statements at trial.

**I.     Facts**

Weighing the testimony and credibility of the witnesses at the hearing on the motion,[1] and for the limited purpose of resolving the motion, the Court finds the following facts:

On November 6, 2006, several law enforcement officers assigned to a DEA task force were engaged in surveillance of Ms. Garcia and her co-defendants, Daniel Anita, Leopoldo Garnica-Anita, and Fernando Garnica, who were suspected of drug activity. A confidential informant (CI), working with the task force, met Daniel Anita at Olivas Auto Body Shop, located in Kansas City, Kansas, and expressed a desire to purchase one-quarter kilogram of cocaine. Officers observed Fernando Garnica speak with Anita and then drive to a residence at 3422 Longwood in Kansas City, Kansas, where he remained for approximately 30 minutes. During that time, Leopoldo Garnica and Ms. Garcia, who were being surveilled by officers, arrived at the residence. Fernando Garnica then returned to the body shop and delivered the purchased cocaine to the CI in Anita's presence.

Later in the day, the CI called Anita at the body shop and asked to purchase an additional three kilograms of cocaine, and Anita agreed. Officers then observed

---

[1] At the hearing, the Government presented testimony from Pamela Bennett and Eric Jones, officers with the Kansas City, Kansas Police Department who had been assigned to a DEA task force; and Jesse Valdez, a deputy with the Johnson County, Kansas Sheriff's Department who had also been assigned to the task force. Ms. Garcia offered only her own testimony at the hearing.

2

Leopoldo Garnica and Ms. Garcia leave the residence at 3422 Longwood and drive in a Ford Explorer to the body shop. Leopoldo Garnica parked the Explorer on the street in front of the body shop, and he exited the vehicle and met with Fernando Garnica outside the body shop. Ms. Garcia remained in the front passenger seat of the Explorer.

At that time, the officers decided to arrest Mssrs. Garnica, Garnica, and Anita. Two or three officers, wearing clothes that identified them as police officers and with guns drawn, arrested Mssrs. Garnica and Garnica approximately 15 to 20 feet in front of the Explorer. Approximately six or seven other officers, led by case agent Officer Eric Jones, entered the business area of the body shop with guns drawn to arrest Daniel Anita. A person sitting in the Explorer would have been able to observe the various officers arrest Mssrs. Garnica and Garnica and enter the business area with the guns drawn.

By the time that Officer Jones returned from the body shop, all officers had re-holstered their weapons, and Mssrs. Garnica and Garnica remained in custody by the street. Officer Jones then noticed that Ms. Garcia had not been removed from the Explorer, but remained slouched down in her seat. Ms. Garcia saw Officer Jones point at the Explorer, and she heard him state that someone remained inside the vehicle. Concerned for the officers' safety and because Ms. Garcia was a witness, Officer Jones approached the Explorer with Officer Pam Bennett. One of the two officers opened Ms. Garcia's passenger-side door and asked her to exit the vehicle. Officer Jones asked Ms. Garcia her name. Officer Jones then left Ms. Garcia and proceeded to speak to Leopoldo

3

Garnica. Believing Mr. Garnica to be the owner of the residence at 3422 Longwood, Officer Jones asked for consent to a search of that residence, but Mr. Garnica refused.

When Officer Jones left the immediate area, Officer Bennett remained and spoke with Ms. Garcia. During this conversation, Officer Bennett asked Ms. Garcia if she had been shopping for shoes, and she indicated to Ms. Garcia that the officers had in fact tailed her to a shoe store earlier that day. After a few minutes, Officer Jones returned to speak with Ms. Garcia and to obtain her consent to a search of the residence if possible. To that point, the officers had spoken in English to Ms. Garcia, who had responded appropriately in English. Nevertheless, when Officer Jones returned to speak to Ms. Garcia, he was accompanied by Deputy Valdez, who speaks Spanish. Deputy Valdez asked Ms. Garcia in Spanish whether she spoke English, and Ms. Garcia replied that she did. Deputy Valdez then asked her to tell the truth to Officer Jones. All subsequent questioning of Ms. Garcia took place in English. Ms. Garcia appeared to understand the questions, and she replied appropriately in English.[2]

Officer Jones and, to a lesser degree, Deputy Valdez proceeded to question Ms. Garcia. At the time of this questioning, Ms. Garcia had not been handcuffed or formally placed under arrest. The officers did not issue her any *Miranda* warnings, and they did not tell her that she could leave or that she was free to refuse to answer their questions.

---

[2]The Court is not persuaded that Ms. Garcia, who graduated from Shawnee Mission North High School in Johnson County, Kansas, did not understand the officers when they spoke to her in English.

4

The officers indicated to Ms. Garcia that she had been seen with the other defendants during the officers' surveillance. After obtaining from Ms. Garcia her name and address, the officers asked her about the residence at 3422 Longwood, and she denied having been there. The officers then told Ms. Garcia that she had been followed from that residence to the body shop. Upon further questioning, Ms. Garcia stated that she lived at the residence with Leopoldo Garnica, her boyfriend; that Fernando Garnica would visit the residence and had done so that day; and that Fernando and Leopoldo usually met there in the kitchen, although she did not know what they did there. Ms. Garcia was asked for consent to a search of the residence, and she responded in the negative.

Subsequent to this questioning, officers handcuffed and formally arrested Ms. Garcia. Ms. Garcia has been charged in this case with one count of maintaining a residence for drug trafficking in violation of 21 U.S.C. § 856(a)(2).

**II.     Analysis**

Ms. Garcia argues that because the officers had not given her *Miranda* warnings, any statements by her to Officer Jones or Deputy Valdez prior to her formal arrest should be suppressed.

> *Miranda* instructs us that the prosecution may not use statements stemming from questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of freedom of action in any significant way unless it first demonstrates the use of procedural safeguards effective to secure the Fifth Amendment's privilege against self-incrimination. *Miranda* goes on to spell out these procedural requirements by specifying what rights the person in custody must clearly

5

understand.

*United States v. Griffin*, 7 F.3d 1512, 1516 (10th Cir. 1993). Simply put, "*Miranda* warnings are required when the defendant is in custody and subject to interrogation." *Id.* at 1517-18. The controlling issue here is whether Ms. Garcia was in custody for purposes of triggering *Miranda* when she was questioned and made statements to Officer Jones and Deputy Valdez.[3]

"[A] suspect can be placed in police 'custody' for purposes of *Miranda* before he has been 'arrested' in the Fourth Amendment sense." *United States v. Perdue*, 8 F.3d 1455, 1463-64 (10th Cir. 1993) (citing *United States v. Berkemer*, 468 U.S. 420, 442 (1984)).

> In order to determine whether or not a person is in custody for *Miranda* purposes, a court must examine all relevant facts, the only relevant inquiry being how a reasonable person in the suspect's position would have understood the situation.

*Griffin*, 7 F.3d at 1518 (citing *Berkemer*, 468 U.S. at 442). A person is in custody if, from an objective viewpoint, someone in her position would reasonably believe that her freedom of action has been curtailed to a "degree associated with a formal arrest." *Id.* (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) and *Berkemer*, 468 U.S. at 440). The officer's subjective intent to arrest the person or place her in custody, at that

---

[3]There is no dispute that Ms. Garcia was subjected to an "interrogation" here for purposes of *Miranda*. *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (defining interrogation as words or actions that the officers should know are "reasonably likely to elicit an incriminating response").

6

time or in the future, is irrelevant. *See id.* at 1518 n.7.

The determination of custody must be made from an examination of the totality of the circumstances. *See id.* at 1518. The Tenth Circuit has noted that, because this determination is necessarily fact-intensive, it has avoided hard-line rules to govern the analysis. *See id.* Nevertheless, the Tenth Circuit has identified three factors that are particularly useful in determining custody for purposes of *Miranda*. *See id.* at 1518-19. The Court believes that it is instructive to set forth the Tenth Circuit's explanation of those factors in full (with citations omitted):

> First, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will often defines the custodial setting. Conversely, the lack of a police advisement that the suspect is at liberty to decline to answer questions or free to leave is a significant indication of a custodial detention.
>
> A second factor indicative of a custodial setting is the nature of questioning. While *Terry* type investigations allow for limited questioning to confirm an officer's suspicions, prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave. Police and suspects should not have to guess as to when custody arises after a temporary stop. In *Berkemer*, the [Supreme] Court advised the practice of giving *Miranda* warnings at the earliest possible point a police/citizen encounter evolves past a *Terry* stop. The principal advantage of *Miranda* is as a simple line of demarcation which may benefit a suspect but which ultimately benefits law enforcement in the reduction of unnecessary dispute [sic] over suppression of evidence. Where the nature of the police/citizen encounter progresses beyond a short investigatory stop, a custodial environment is more likely.
>
> A final factor commonly examined is the circumstances showing a "police dominated" atmosphere. Where police are in full control of the questioning environment, custody is more easily found. Circumstances might include: separation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms;

7

> threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.

*Id.* (citations omitted).

The Government argues that Ms. Garcia was not in custody under the totality of the circumstances. In support of that argument, the Government cites the following facts: at the time of the questioning, the officers had not formally arrested Ms. Garcia, and they never told her that she could not leave; Ms. Garcia did not ask to leave the scene; the questioning took place in a public place; the guns had all been put away; and the officers did not handcuff or threaten Ms. Garcia. The Government also cites Ms. Garcia's refusal to consent to a search of the residence as evidence that she understood that she could refuse to cooperate with the officers.

The Court finds, however, based on the totality of the circumstances, that a reasonable person in Ms. Garcia's position would not have believed that she was free to leave the scene. That conclusion is supported by a consideration of the three factors employed by the Tenth Circuit in *Griffin*.

First, the officers did not indicate to Ms. Garcia that she was free to leave or to refuse to answer their questions. As the Tenth Circuit has noted, the lack of such an advisement is a "significant indication of a custodial detention." *Griffin*, 7 F.3d at 1518.

Second, the nature of the officers' questioning of Ms. Garcia also favors a finding that Ms. Garcia was subjected to a custodial interrogation here. The officers did not

8

confine themselves to seeking preliminary information, such as Ms. Garcia's identity and the location of any weapons; accordingly, Ms. Garcia's encounter with the law enforcement officers proceeded beyond a mere *Terry* stop. Officer Jones testified that he was interested in Ms. Garcia specifically as a witness. The questions to Ms. Garcia were accusatory. She was told repeatedly that she had been surveilled and that she had been seen with the co-defendants. She was asked specifically about the residence at 3422 Longwood. When Ms. Garcia denied familiarity with the residence, she was told that she had been followed from there, and the question was repeated. Even after Ms. Garcia admitted her connection to the residence, she was subjected to further questioning about activities there. Thus, it would have appeared to a reasonable person in Ms. Garcia's position that the officers were attempting either to catch her in a lie or to obtain evidence that incriminated her and others.

In *Griffin*, in which the Tenth Circuit reversed a district court's refusal to suppress certain statements, the court emphasized that the questioning in that case had been case-specific and had continued even after the defendant had been incriminated. *See id.* at 1519. Similarly here, the officers asked accusatory, case-specific questions that continued even after Ms. Garcia had incriminated herself. As the Tenth Circuit noted, such questioning "is likely to create a coercive environment from which an individual would not feel free to leave." *Id.* at 1518. The court agrees with the Tenth Circuit that a suspect should not be required in a such a situation to guess when custody arises after the initial stop. *See id.*

Third, the Court finds that the questioning of Ms. Garcia took place in an extremely police-dominated atmosphere. Ms. Garcia had just seen up to ten officers descend upon and secure the area with guns drawn. She had also observed the arrest at gunpoint of her boyfriend, with whom she had just arrived, and another co-defendant within 20 feet in front of her vehicle. Immediately preceding her questioning, Ms. Garcia had seen and observed Officer Jones as he noticed her presence in the vehicle and indicated that she should have already been secured. Officers opened her car door and asked her to step outside the vehicle, acting with some urgency out of a concern for their safety. Ms. Garcia was then subjected to specific, accusatory questions, including apparent attempts to catch Ms. Garcia lying.

Although the Government portrays the questioning itself as a polite conversation without threats and with guns put away, the events that immediately preceded the questioning and the particular questions themselves cannot so easily be dismissed. There is no doubt that the interrogation of Ms. Garcia took place in a highly charged atmosphere. Because the officers were in full control of the questioning environment, custody is more easily found here. *See id.* at 1518-19.

Accordingly, based on the totality of the circumstances, the Court finds that Ms. Garcia was in fact in custody for purposes of *Miranda* at the time of her interrogation by Officer Jones and Deputy Valdez. Like *Griffin*, this case "typfies the situation *Miranda* was meant to protect." *Id.* at 1519. A reasonable person under the same circumstances faced by Ms. Garcia would believe that her freedom of action had been curtailed and that

10

she had no choice but to continue to answer the incriminating questions. Therefore, the motion to suppress must be granted.

IT IS THEREFORE ORDERED THAT Ms. Garcia's motion to suppress (Doc. #32) is granted, and the Government may not use at trial any statements made by Ms. Garcia to Officer Eric Jones or Deputy Jesse Valdez on November 6, 2006, prior to her formal arrest.

IT IS SO ORDERED.

Dated this 28th day of March, 2007, in Kansas City, Kansas.

                                                  s/ John W. Lungstrum
                                                  John W. Lungstrum
                                                  United States District Judge